MARK K. SCHONFELD (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, NY 10281
(212) 336-0080 (Brody)


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,           :
                                              :
                Plaintiff,                    :
                                              :
                                              :    07 Civ. 9525 (RMB)
        -against-                             :
                                              :
                                              :
THOMPSON PRICE HOLDING INC. AND               :
DAMIR LUKOVIC a/k/a GREG THOMPSON             :
                                              :
                Defendants.                   :
                                              :
                                              :
------------------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS EMERGENCY APPLICATION
FOR TEMPORARY RESTRAINING ORDERS,
PRELIMINARY INJUNCTIONS, ORDERS TO SHOW
<u>CAUSE, ASSET FREEZES, ACCOUNTINGS, AND OTHER RELIEF</u>**

Plaintiff Securities and Exchange Commission (the "Commission") submits this memorandum of law in support of its application for emergency relief against Thompson Price Holding Inc. ("Thompson Price") and Damir Lukovic a/k/a Greg Thompson ("Lukovic") (collectively "Defendants").

## PRELIMINARY STATEMENT

By this application the Commission seeks to halt a fraudulent scheme in which Defendants have represented to investors that they had the ability to sell shares of stock from the initial public offerings ("IPOs") of several Australian companies. To date, Defendants' scheme has raised at least $107,730, virtually all of which Lukovic withdrew from company accounts and, upon information and belief, used for his own purposes. As part of this scheme, Defendants represented to individual investors (many of whom were senior citizens) that Thompson Price had received allocations of shares in IPOs for public companies located in Australia, and that the investors could participate in the IPOs by purchasing stock directly through Thompson Price. In fact, each of these representations was false and misleading: Defendants were not associated in any fashion with any of the Australian IPOs. Defendants never received an allocation of IPO shares. And most important, Defendants never intended to purchase shares on behalf of the investors but rather intended to use the funds for their own purposes. This fraudulent conduct is ongoing. Defendants have continued to make such misrepresentations to investors within the past three weeks. Accordingly, by this application the Commission seeks to freeze the Defendants' assets in order to halt the further dissipation of any investor funds, and to preserve any assets that Defendants may be obligated to pay upon the entry of a final judgment ordering the disgorgement of ill-gotten proceeds and penalties. By this application the Commission also seeks an Order: (i) temporarily and preliminarily enjoining the Defendants from violating

Section 17(a) of the Securities Act of 1933 ("Securities Act"), Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder; (ii) requiring each Defendant to provide a verified accounting; (iii) prohibiting the destruction, alteration, or concealment of documents; and (iv) providing for expedited discovery.

## STATEMENT OF FACTS[1]

### I.     BACKGROUND

Damir Lukovic, age 31, is citizen of the former Yugoslavia, who has recently resided in Brooklyn, New York and Clifton, New Jersey. (Libal Dec. at ¶ 8). Since at least October 2006, and continuing until the present, Lukovic has controlled Thompson Price, whose only income results from defrauding investors in the United States. (Id. at ¶¶ 6-7). In September 2006, Lukovic rented Thompson Price's private mailbox in New York City. (Id. at ¶ 13). In October 2006, representing himself as Thompson Price's president, Lukovic opened a bank account for Thompson Price (Id. at ¶ 5). Lukovic is not registered as a broker or dealer and is not associated with any registered broker or dealer. (Id. at ¶ 12). Upon information and belief, Lukovic uses the pseudonym "Greg Thompson" when communicating with potential investors. The basis for this belief is the fact that Greg Thompson identifies himself as the President of Thompson Price, a position known to be held by Lukovic as demonstrated by the bank account records.

Thompson Price is a New York corporation that purports to be a broker-dealer with an office in New York City. (Id. at ¶¶ 4, 10). In communications with investors, it has also identified itself as Thompson Price Holdings Inc. (Id. at ¶ 10). Its current address is a call center

---

[1] The facts set forth in this Memorandum are supported by the accompanying Declaration of Dawn Libal, a Staff Accountant in the Broker-Dealer Inspection Program in the Commission's New York Regional Office located in New York, New York, executed on October 22, 2007 ("Libal Dec."). The Libal Declaration includes summaries of the conversations between the Commission Staff and the defrauded investors.

in New York, New York. (Id. at ¶ 16). Its prior address was a mailbox located in New York, New York. (Id. at ¶ 13). Thompson Price is not registered with the Commission as a broker or dealer. (Id. at ¶ 12).

## II.     THE DEFENDANTS' MISREPRESENTATIONS TO INVESTORS

Since at least October 2006 and continuing to the present, Defendants solicited purchases of securities from at least ten individuals in the United States, five of whom are senior citizens. (Id. at ¶¶ 10-11). While making solicitations, Lukovic claimed to be Thompson Price's president, "Greg Thompson," and that Thompson Price was a brokerage firm soliciting purported investments in several Australian IPOs. (Id. at ¶ 10). Lukovic represented to investors that Thompson Price had received allocations of shares in IPOs for public companies located in Australia, and that the investors could participate in the IPOs by purchasing stock directly through Thompson Price. (Id.) When the investors agreed to purchase the shares, Thompson Price mailed copies of prospectuses along with instructions for investors to pay for the purchase of their shares. (Id.) At Lukovic's direction, the investors sent checks payable to Thompson Price directly to Thompson Price's New York office, which, in reality, was a mailbox located within a UPS Store. (Id. at ¶¶ 10, 13). The investors never received any stock certificates. (Id.) Moreover, when some of the investors sought to sell their shares, they were told that a sale was impossible because their investment was part of a larger block of stock that could not be split. (Id. at ¶¶ 10b, 10f).

Thompson Price had no relationship with any of the Australian companies or their IPOs. (Id. at ¶ 15). Thompson Price was not an underwriter and it never received an allocation of shares in connection with those IPOs. (Id.) Moreover, upon information

and belief, Thompson Price did not purchase any stock of the Australian IPOs for its investors as it represented it would. Instead, of the at least $107,730 unlawfully raised in this scheme, at least $92,940 were deposited into Thompson Price's account at JP Morgan Chase (account number 72612973) (the "JP Morgan Account"). (Id. at ¶ 7). Lukovic endorsed most of the checks deposited into this account. (Id. at ¶ 6). The investors' funds were subsequently withdrawn from Thompson Price's bank account by checks Lukovic wrote to himself or by ATM withdrawals, many of which were in Brooklyn, York or Clifton, New Jersey, locations where Lukovic lived. (Id. at ¶ 8). The statements for the JP Morgan Account reflect a total of $76,143.50 in ATM withdrawals (and related ATM withdrawal fees) during the period of October 25, 2006 through August 31, 2007. (Id.) The JP Morgan Account statements also reflect ATM withdrawals from multiple ATMs on the same day. For example, on February 12, 2006, $2,600 was withdrawn from the following locations in Brooklyn:

| Location | Amount |
| --- | --- |
| 2560 Ocean Avenue | $601.50 |
| 1722 Avenue U | $600.00 |
| 2730 Coney Island Avenue | $600.00 |
| 1722 Avenue U (2nd time) | $401.50 |
| 2730 Coney Island Avenue (2nd time) | $400.00 |

(Id.) The JP Morgan Account records also reflect two checks drawn on the JP Morgan Account (check numbers 1001 and 1002) made directly payable to Damir Lukovic for the total amount of $16,500. (Id. at ¶ 9).

### III. THE FRAUD IS ONGOING

This fraud is continuing. On or around October 10, 2007, Thompson Price solicited an investor to purchase shares in another Australian company. (Id. at ¶ 10c). During the week of October 1, 2007, Thompson Price attempted to sell shares of a

different IPO to another investor. (Id. at ¶ 10d). During the first two weeks of October 2007, Thompson Price solicited a third investor to purchase share in an IPO for Global Construction Services Limited and the shares of what Thompson Price said was another company, Laser Bond. (Id. at ¶ 10e).

## ARGUMENT

I. **DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975). It need not show irreparable injury, a balance of equities in its favor, or the unavailability of remedies at law. Id. at 808; SEC v. Bonastia, 614 F.2d 908, 912 (3d Cir. 1980); SEC v. Graystone Nash, Inc., 820 F. Supp. 863, 875 n.13 (D.N.J. 1993), rev'd on other grounds, 25 F.3d 187 (3d Cir. 1994). Instead, the Commission need only make a "proper showing" of violative activity to obtain a temporary restraining order or preliminary injunction against statutory violations. Specifically, the Commission must make a proper showing of (i) a current violation; and (ii) the risk of repetition. See SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998); Mgmt. Dynamics, 515 F.2d at 807; Bonastia, 614 F.2d at 912 ("reasonable likelihood" of repetition must be shown).

Here, the Commission easily meets the standard. Defendants made fraudulent representations to numerous investors over the past year and, based on their continued solicitations over the past several weeks, there is every indication that Defendants will

continue their fraudulent offerings if not stopped. If a temporary restraining order is not entered, Defendants' ongoing scheme will ensnare yet new victims.

A.  **Defendants Have Violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

Defendants have violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Section 17(a) of the Securities Act prohibits fraudulent conduct by any person in the offer or sale of securities, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of a security. See United States v. Naftalin, 441 U.S. 768, 772, 778 (1979). To establish a violation of these provisions (collectively, the "antifraud provisions"), the Commission is required to show that the defendants made a material misrepresentation or omission and that they acted with scienter in doing so.

Scienter is a mental state embracing intent to deceive, manipulate, or defraud. Ernst & Ernst v. Hochfelder, et al., 425 U.S. 185, 193 (1976).[2] The United States Court of Appeals for the Second Circuit has held that reckless conduct generally satisfies the scienter requirement. See, e.g., SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) (holding that scienter required for a Section 10(b) or Rule 10b-5 claim "may be established through a showing of a reckless disregard for the truth"), citing Rolf v. Blyth, Eastman, Dillon & Co., 570 F.2d 38, 46 (2d Cir. 1978); Sirota v. Solitron Devices, Inc., 673 F.2d 566, 573 (2d Cir. 1982).

---

[2] A violation of Section 17(a)(1) of the Securities Act also requires a showing of scienter. However, the U.S. Supreme Court has held that scienter need not be shown in order to establish violations of Sections 17(a)(2) and (3) of the Securities Act. Aaron v. SEC, 446 U.S. 680, 696-97 (1980).

The misrepresentations and omissions outlined above are material because there is a substantial likelihood that a reasonable investor would consider such information important in making an investment decision. Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). A reasonable investor would consider this information to be material when analyzing whether to invest. See, e.g., SEC v. Research Automation Corporation, 585 F.2d 31, 35 (2nd Cir. 1978) (fact that investor proceeds were being used for defendants' personal benefit rather than for company's working capital was material).

The evidence establishes that the Defendants are responsible for the misrepresentations and omissions and acted with scienter in misleading investors. They made numerous misrepresentations and omissions to investors surrounding their proposed investment in Australian IPOs, including: (i) falsely stating that Thompson Price had received allocations of shares in IPOs for public companies located in Australia; (ii) falsely stating that investors could participate in the IPOs by purchasing stock directly through Thompson Price; and (iii) falsely stating that all money sent by investors would be used to purchase the securities. In fact, Defendants were not an underwriter or broker-dealer, were not associated with the IPOs of these Australian companies in any fashion, did not receive an allocation of IPO shares, and did not intend on using the investors' money to purchase shares on their behalf. In sum, the Defendants have violated, and are continuing to violate, the antifraud provisions of the federal securities laws. Lukovic's scienter is imputed to Thompson Price because "[a] company's state of mind may be imputed from that of individuals controlling it." In the Matter of Horton & Company, SEC AP No. 3-10355, 2002 WL 1430201, at *10 (July 2, 2002) (citing SEC v. Blinder Robinson & Co., Inc., 542 F. Supp. 468, 476 n.3 (D. Colo.

1982), aff'd, 1983 WL 20181 (10th Cir. Sept. 19, 1983)); SEC v. Manor Nursing Ctrs. Inc., 458 F.2d 1082, 1096-97 nn. 16-18 (2d Cir. 1972)).

### B.  The Defendants Are Likely to Continue Their Illegal Conduct

In determining whether to grant emergency relief, courts consider whether there is a reasonable likelihood that the defendant will again engage in illegal conduct. Bonastia, 614 F.2d at 912. In assessing that likelihood, courts consider such factors as the "isolated or recurrent nature of the infraction," the degree of scienter involved, and whether future violations may occur because of the defendant's occupation. Id. (citing SEC v. Mgmt. Dynamics, Inc., 515 F.2d at 807); SEC v. Shared Medical Sys. Corp., Civ. A. No. 91-6546, 1992 WL 208029, at *7 (E.D. Pa. Aug. 17, 1992).

Defendants have been engaged in the same conduct for the past year and show no inclination to stop now. In fact, within the past several weeks, Defendants have continued to solicit participation from investors in new purported IPOs. Given the nature and persistence of the Defendants' fraud, temporary restraining orders and preliminary injunctions are warranted to prevent further solicitation of investors.

## II.  THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION OF INVESTOR ASSETS AND PROSECUTION OF THE CASE

The Court should order asset freezes and accountings to preserve and identify investor assets. The Court should also order expedited discovery and prohibit the destruction of documents and witness tampering to allow for the efficient and just prosecution of this action.

### A.  The Court Should Enter an Order Freezing Defendants' Assets

It is well-established that a court has the authority in securities fraud cases to grant ancillary relief, such as an asset freeze, in order to preserve funds necessary to satisfy any final judgments the court may enter ordering the disgorgement of profits or civil penalties. Manor Nursing, 458 F.2d at 1103, 1105-06. In fact, the showing needed to warrant an asset freeze is lesser than that required to support an injunction. See, e.g., SEC v. Unifund, SAL, 910 F.2d 1028, 1041 (2d Cir. 1990) (court upholding asset freeze, despite finding insufficient basis to enter preliminary injunction).[3] Where there are concerns that defendants might dissipate assets, a court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. Id.; SEC v. Infinity Group Co., 212 F.3d 180, 197 (3d Cir. 2000) (purpose of asset freeze is to preserve status quo by preventing dissipation and diversion of assets). The entry of an order freezing the Defendants' assets is appropriate here, where there is ample evidence of both violations of the securities laws and the continuing dissipation of assets. As noted above, the Defendants are continuing to make misrepresentations to investors and Defendant Lukovic has withdrawn all of the money in the JP Morgan Account for his personal needs. Accordingly, the Court should grant an asset freeze over the assets of the Defendants to protect investors from the further dissipation of assets, and to preserve funds for the payment of disgorgement and penalties.

**B.     The Court Should Order Defendants to Provide Verified Accountings**

---

[3] The entry of an asset freeze in a civil case may be appropriate even where it may interfere with a party's ability to retain criminal counsel in a parallel criminal action pursuant to the adage that a "defendant is not entitled to foot his legal bill with funds that are tainted by his fraud." SEC v. Coates, 94 Civ. 5361 (KMW), 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994) (citing U.S. v. Monsanto, 491 U.S. 600 (1989)).

Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of unjust enrichment and defendants' current financial resources.  See, e.g., Manor Nursing, 458 F.2d at 1105; SEC v. Infinity Group Co., 27 F. Supp. 2d 559, 561 (E.D. Pa. 1998) (court has full panoply of equitable remedies).  In this case, because bank records obtained so far indicate that Lukovic withdrew money from the Thompson Price account through checks written to him or through ATM withdrawals, an accounting is necessary for determining the disposition of funds, the amount of the Defendants' unjust enrichment, and the assets available for disgorgement.

### C. The Court Should Order Expedited Discovery and Prohibit the Destruction of Documents

The Court should grant the Commission's request for expedited discovery to allow the Commission to act quickly to obtain records from the Defendants and other records from third parties necessary to identify and preserve investor assets and determine, among other things, the location and use of investor proceeds.  Likewise, the Court should enter an order prohibiting the Defendants from destroying and altering documents to preserve as much of the evidence as possible given the Defendants' continuing misconduct.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying Declaration and exhibits, the Commission respectfully requests that its application be granted.

Dated: New York, NY
October 25, 2007

Respectfully submitted,

By: _____
Todd D. Brody (TB-2869)
Senior Trial Counsel
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center
New York, NY 10281
(212) 336-0080

Of Counsel:
Mark Schonfeld
Gerald A. Gross
John Nowak
John J. Graubard
Reena Agrawal